[Misc. No. 1280. In Bank.—May 28, 1934.]

In the Matter of AN INVESTIGATION OF THE CONDUCT OF THE EXAMINATION FOR ADMISSION TO PRACTICE LAW.

H. C. Wyckoff, President, The State Bar· of California, Alfred L. Bartlett, Chairman, The Committee of Bar Examiners, M. R. Kirkwood, Wm. N. Simmons, Gordon Johnson, Orrin K.. McMurray, William G. Hale, Edwin J. Owen, Arthur E. Briggs and Kimball Fletcher, in support of existing methods of examination.

Joseph F. Ferrea, William F. Peters, Rollin L. McNitt, C. W. Welch, J. B. Zimbars, Lucas F. Smith, Stanford G. Smith, McFarland, Scheinman & Sisenwein and George L. Keefer, in opposition to existing methods of examination.

WASTE, C. J.—Immediately following the announcement by the committee of examiners of The State Bar of California of the result of the August, 1933, examinations of applicants for admission to practice law, there were filed in

this court by unsuccessful applicants a number of petitions for writs of review, in which the petitioners alleged that they had met the standards set by The State Bar for the examinations. They therefore prayed that the court order the production before it of the particular examination papers of the respective petitioners, together with the records of the examiners showing the markings each had received, and other records and papers which the court might deem necessary for the purpose of ascertaining and determining that, notwithstanding the report of the bar examiners, petitioners were qualified to practice law in this state.

The substance of petitioners' charges was that the committee of bar examiners had arbitrarily, unjustly and in a discriminatory manner: Determined in advance the number of applicants who should be permitted to pass the examinations, and had selected questions to be, and which were, propounded to the applicants, of such nature that, rated on an arbitrary, unreasonable and abstract scale of 100 per cent, it was possible to pass or reject at will any number of applicants taking the examinations; and that the committee had refused to consider *all* of the qualifications of the petitioners for admission to the practice of law.

The formal applications were filed by the petitioners under the provisions of section 38 of the State Bar Act, which this court has construed to be a special enactment, not limiting the review to the scope of a "writ of *certiorari*" as defined in the Code of Civil Procedure, but permitting a re-examination of the entire record of the particular proceeding complained of. (*In re Shattuck*, 208 Cal. 6 [279 Pac. 998].) Upon review, the burden is on the petitioner to show wherein the decision of the board or authorized and acting committee is erroneous or unlawful. (State Bar Act, sec. 26.)

Almost coincident with the filing of the formal petitions referred to, the court received a flood of communications from applicants who failed to pass the examinations. Members of the bar and others importuned the court in behalf of the rejected applicants. Many of these communications from applicants were, we feel, based upon a mistaken conception as to the "right to practice law". Many of them seemed to be of the view that they had a "vested right" to

practice law, and were, in their own minds, firmly convinced that this court should forthwith exercise its inherent power and make its order admitting them to such privilege, notwithstanding the recommendation of The State Bar.

The charges made concerning the results of the August, 1933, examinations were not the first of that nature to be considered by the court. In the case of one Callinan, who failed to pass the bar examination on a previous occasion, the court formulated and announced the policy it would adhere to in considering such complaints, as follows:

██ "The attitude of this court is that if any dissatisfied applicant can show that he was denied passage of the state bar examinations through fraud, imposition, or coercion, or that in any other manner he was prevented from a fair opportunity to take the examinations, this court will be willing to listen to his complaint. Inability to pass the examinations, which are successfully passed by other applicants, will, of course, not be inquired into by the court. Also, as you have no doubt found out, one's general qualifications are not to be substituted for the requisite knowledge of law which one must possess in order to be admitted into the legal profession."

The report of the results of the August, 1933, bar examinations disclosed that of the 831 applicants taking the examinations only 263, or 31.6, plus, per cent were passed and recommended to this court for admission to practice law. The small percentage of successful applicants, and the number of those who had failed to pass one or more previous examinations, seemed to call for an explanation; and, so great was the insistence with which the present claims were urged that the court deemed it proper to enter into a consideration of the situation to ascertain, if possible, why an increasingly large number of applicants were unable to pass the bar examinations. Accordingly, such an inquiry was ordered. A hearing on the formal petitions and the return of The State Bar was ordered, at which hearing all the unsuccessful applicants were permitted to appear, and at which many of them, in open court, personally stated their views, a few presenting their individual contentions relative to the examinations. Other than from The State Bar, but little contention was advanced or argument offered

at the hearing that did not appear in the formal petitions and communications, and with which the justices of this court were already familiar. Speaking generally, these contentions were that the examinations were "very hard"; the questions were an unfair test of the necessary qualifications for the practice of the law; the method of marking or grading the answers was unfair, arbitrary and discriminatory; the applicants' answers, if properly graded, would have resulted in the required percentage, and in a passing grade entitling the applicants to a recommendation to be admitted to practice law. Charges of unfairness, arbitrariness, fraud and dishonesty in the marking and grading of answers were made by some of the applicants. These charges may be disregarded, for nothing has been developed or shown to substantiate them.

The State Bar, through its board of governors and committee of bar examiners, made its return, and not only put in issue the allegations of the petitions filed, but also challenged the many accusations and charges contained in the petitions and made by other unsuccessful applicants. The method of examining applicants adopted by The State Bar, and the conduct of the examinations were fully explained. The court requested, and The State Bar has transmitted, the entire record pertaining to the August, 1933, bar examinations, including the papers of many applicants taking the tests. The justices of the court have carefully inspected the record, giving particular attention to the questions and answers and to the markings or gradings of many of the applicants.

When the August, 1933, examination was given, the rules governing The State Bar, approved by this court, prevented many of those failing to pass that examination from taking the next ensuing examination (February, 1934), and some could not take the second ensuing examination. Following the hearing, and the inspection of the record by the court, it ordered that all applicants who failed at the August, 1933, examination, and who received a credit of 50 per cent or more in that examination, but less than 70 per cent, and who failed to pass a previous bar examination, be permitted to take the examination in February, 1934, without regard

to the provisions of Rule V, subdivision e, of The State Bar.

The court also requested of The State Bar that the answers of all those applicants who received 60 per cent or more, but less than 65 per cent, and who failed to be recommended for admission, be re-read by the reviewers regularly employed by the board of bar examiners who re-read the papers of those applicants at said examination receiving between 65 per cent and 70 per cent; provided that such re-reading and review be without prejudice to a re-reading and review, if that be deemed necessary by the court, by a committee of the bar selected by the court. As it appeared from the record that, after the "readers" had completed their examination of the papers of the applicants, the papers of 129 of the applicants rated by the readers between 65 per cent and 70 per cent were examined by the "reviewers", who increased the percentages of 114 sufficiently to permit them to pass, the court also called for the answers of the remaining 15 of the applicants who failed to pass after such review, for the purpose of examining and checking their answers. The full set of books of each of these applicants was referred to the members of the committee of bar examiners for personal examination and review by them. The court is now in receipt of the report on the various steps ordered by it or undertaken by The State Bar or its committees. We have also the report of the result of the examination of applicants had in February, 1934.

The 15 sets of papers referred to the members of the committee of bar examiners were personally and carefully reviewed by individual members of the committee, who, after such review, came to the unanimous conclusion that no one of the 15 applicants could be given a mark which would justify the committee in recommending his admission to the bar. As a further result of this review and the information secured by them, the members of the committee came to the conclusion that the regular board of review, in examining the books assigned to it, had given a passing grade when it could be conscientiously done, and that the applicant, when there was a doubt, had been given the benefit of that doubt; and that the previous review had been a liberal one.

The board of review completed its examination of the

books of the applicants who received original grades of 60 per cent or more, and less than 65 per cent, conducting such review in the customary manner, and applying the usual standards. The board reported to the committee that it had not found that any applicants were entitled to have the original marks assigned to them raised sufficiently to entitle them to pass the examination. We deem it unnecessary to subject these papers to a further re-reading. Of the 557 applicants who took the examination in February, 1934, 159, or 28.5 per cent passed the tests imposed. Of the 557 applicants, 147 took the examination for the first time. The remaining 410 were repeaters, 214 having failed one previous examination, and 196 having failed two or more previous examinations.

Under the present system of examining and admitting applicants to practice law in this state, we do not see what more can be done for the applicants who failed to attain a grade entitling them to a recommendation for admission to practice. █ It has been the rule in this state, recognized and adhered to by bench and bar from the early days of the state's existence, that ''The right to practice law is not an absolute right, derived from the law of nature. It is the mere creature of the statute, and when the license is issued and the official oath taken, which authorizes the attorney to exercise the right, it confers but a statutory privilege, subject to the control of the legislature.'' (*Cohen* v. *Wright*, 22 Cal. 293, 319.) The power of the legislature to provide for the admission of persons to practice law in this state has been continuously exercised. Until the enactment of the present State Bar Act (Stats. 1927, chap. 34, p. 38), the law governing the subject has been found in the Code of Civil Procedure. It is now to be found in section 24 of the Bar Act, as amended (Stats. 1931, chap. 861, p. 1761). █ By its provisions, the board of governors of The State Bar has the power to fix and determine the qualifications of applicants for admission to practice law in this state, and to constitute and appoint an examining committee to examine applicants for admission, to adminster the requirements for admission to practice, and to certify to this court for admission those applicants who fill the requirements and successfully pass the examinations. █ It is not shown in

these proceedings that any detail in the mechanics provided by the governors of The State Bar in the process of admitting applicants to practice has been omitted. Stripped of much incompetent, irrelevant and immaterial matter, the allegations of the various petitions, and the charges and statements in the many communications received by the court narrow down to a charge that the examination of August, 1933, was unnecessarily hard and, even so, did not properly tend to determine the qualifications of the applicants to practice law. Every petition and every communication emphasizes the charge that the marking of the answers to the questions, and the grading of the applicants, were unduly and excessively strict. It was because of these direct charges that the court determined to, and has, inquired into the examination and its results. We have found nothing that permits of any interference by the court with what appears to have been a duly authorized and conducted examination. Those applicants who failed to pass the examination did not satisy the bar examiners, by their answers to the questions asked, that they possessed sufficient knowledge to entitle them to practice law.

In the days when the ''older generation'' of attorneys sought admission to practice law in this state, a short oral examination conducted in person by the justices of the Supreme Court, and later by the justices of the District Courts of Appeal, was deemed a sufficient opportunity for the court to determine the qualifications of those seeking admission to practice. The justices were inclined to, and did, give considerable consideration to what, for a better name, was called ''the background'' of the applicant's preparation. His opportunity for, and the extent of, his education; his ability and aptitude developed in meeting the oral test; the circumstances and surroundings attending his legal studies and preparation to practice law; these and like matters were taken into consideration by the examiners. Even the personal appearance and other phases of the personality of the applicant were known to have turned the scale in favor of one who was within a narrow margin of failure or success. Such an examination no doubt had its defects, but it afforded one opportunity to which we are willing to subscribe as an essential feature in examining applicants for admission to practice law—a

personal contact between the applicant and the examining authority, with the resulting opportunity of supplementing the examination in subjects strictly legal with an inquiry along lines of common sense and with regard to the ordinary activities of life, which may well add to the applicant's other qualifications, and, in connection with those, actually demonstrate that the applicant is qualified to enter the practice of law.

We venture to suggest that our present method of examining applicants for admission to practice is not perfect. One defect is the lack of personal contact just discussed. Another, but possibly contained in the first, is that bar examinations are not a complete test of the qualifications of an applicant. In this connection, we quote from "Notes on Legal Education", issue of November, 1933: "The bar examination is an auxiliary mechanism which in two or three days attempts to find out how much has been learned in three or four years. Examiners themselves are the first to admit that it does not function accurately in testing the mental ability and the qualities required of a lawyer. It is only one factor in a system which the majority of the bar has agreed should also include a certain amount of general education and a definite minimum quantity of good law school training." The examinations by the justices in former times cannot now be conducted by them or by others. No court can so examine more than five hundred, or nearly a thousand, applicants and conduct its regular business. We appreciate the difficulties and burdens cast upon boards of governors and examining committees by the State Bar Act. They are men of experience and standing in the legal profession, who devote their time and effort to the laborious work assumed by them without compensation beyond the reward that attends the realization of a service well performed. The examination made by the court into the conduct of the August, 1933, bar examination has not brought to light anything discrediting them or the assistants employed by them in the conduct of the examination. So much must be positively and unequivocally stated. We are of the view, however, that more can be accomplished in the way of giving greater consideration to the cases of those students who, on first marking of their answers, are graded within a small per cent, sometimes only a fraction of one

per cent, of passing the examination. The committee has been liberal in this regard, as witness the re-examination of the papers of, and the final passing of, the 114 "border line" applicants at the August, 1933, examinations, already referred to. While it is not within the record of this hearing, we are informed that the same practice was had following the recently completed February, 1934, examinations. The papers of some 140 applicants who attained a grade of 65 per cent to 70 per cent, inclusive, on first reading were reviewed, and 37 were accorded a passing grade. More can be done in this connection, we believe, by working out a plan of personal contact along the line we have discussed, without in any way departing from the advanced standards to which The State Bar of California has subscribed, with the full approval of the people of the state.

For these reasons, the report of the committee of bar examiners of The State Bar on the August, 1933, examinations is affirmed. The various petitions for review and motions for admission to the bar are discharged.

Shenk, J., Preston, J., and Thompson, J., concurred.

LANGDON, J., Concurring.—I concur in the conclusion reached by the court, but desire to state my view on an issue raised in many of the petitions and not herein considered. The rules regulating admission to practice law prohibit an applicant who has twice failed in the examination from taking the following examination; and further provide that upon three failures, the applicant must allow two examinations to intervene. The purpose of this rule is, no doubt, to discourage unsuccessful applicants, but I am unable now to perceive its value or its reasonableness. A student who, after failure, engages in further study, should not, I believe, be prevented from presenting himself again for the examination. I am of the opinion that the rule should be modified to permit students to take examinations subsequent to failure, upon a showing of continuous additional study, satisfactory to the committee of bar examiners.